**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **LOWRY W. CRANE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **7:04-CV-0204-BF (R)** |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

This is a social security appeal in which the parties have consented to a trial before the

United States Magistrate Judge. Lowry W. Crane ("Plaintiff") seeks judicial review of a final

decision by the Commissioner of the Social Security Administration ("Commissioner"). The

Commissioner denied his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act. The Court has considered the record, Plaintiff's Brief, Defendant's Response to

Plaintiff's Brief, and Plaintiff's Reply Brief. The Court hereby **REVERSES** the Commissioner's

final decision and **REMANDS** the case for further consideration.

**I.    Background**[1]

    **A.    Procedural History**

        Plaintiff filed his application for DIB effective May 11, 1999, alleging that he became

disabled on December 21, 1998. (Tr. at 164-73.) His application was denied both initially and

upon reconsideration. Plaintiff then timely requested a hearing before an Administrative Law Judge

("ALJ"). The ALJ convened the hearing on June 27, 2000, and issued an unfavorable decision on

July 28, 2000. (*Id*. at 67, 88-94.) The Appeals Council granted Plaintiff's request for review of the

---

[1] The following procedural history comes from the transcript of the administrative
proceedings. References to the transcript are designated as "Tr."

ALJ's decision, vacated the ALJ's decision, and remanded the case for a new hearing.  (*Id*. at 116-19.)  On March 21, 2002, ALJ Tela L. Gatewood held a hearing, and on September 5, 2003, she denied Plaintiff's application for DIB.  (*Id*. at 29, 11-27.)  Plaintiff again requested review by the Appeals Council, and it denied review on September 27, 2004, rendering ALJ Gatewood's decision the final decision of the Commissioner.  Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff alleges that the ALJ's finding as to Plaintiff's Residual Functional Capacity ("RFC") is not supported by substantial evidence and results from prejudicial legal error.  (Pl's Br. at 25.)  He further alleges that as a result, the Commissioner failed to meet her burden of proof at Step Five of the sequential evaluation of disability to prove that there is gainful employment other than Plaintiff's past relevant work available in the national economy that Plaintiff is capable of performing.  (*Id*.)  The Commissioner asserts that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence and does not result from prejudicial legal error.  (Def.'s Br. at 3-13.)

**B.** **Factual History**

**1.** **Plaintiff's Age, Education, and Work Experience**

Plaintiff's date of birth is October 31, 1952.  (Tr. at 155.)  He has the equivalent of a high school diploma, a GED.  (*Id*. at 33.)  According to the vocational expert ("VE") who testified at the hearing, Plaintiff's past relevant work includes correctional officer (medium and semi-skilled); jailer (light and semi-skilled); security responsibility for a hospital (usually sedentary but exertionally light, as performed by Plaintiff, and skilled); tractor driver/operator (medium and semi-skilled); and police officer (medium and skilled). (*Id*. at 56-57.)  The VE testified that Plaintiff had acquired

potentially transferable skills from his past work including interviewing inmates and knowing proper interviewing techniques. (*Id*. at 58.) Other transferrable skills included completing behavior reports of all kinds, such as incident reports, reports of disturbances, and reports of injuries. Additionally, the VE testified that Plaintiff had acquired knowledge of security procedures and the ability to read and understand guidelines for state regulations, for jail safety and security, and for grievance reports. (*Id*.)

## II.   Determination

### A.   Plaintiff's Medical Evidence

In 1994, Katherine Merra, M.D., performed a "left knee arthroscopy with partial medial and lateral meniscectomies of Plaintiff's left knee after he injured it at work." (Tr. at 280-81.) Plaintiff did not receive post-operative treatment because Dr. Merra left town. (*Id*. at 263.) In 1995, David Borman, M.D., performed surgery on Plaintiff's right should after he injured it in an altercation with an inmate during his work as a correctional officer. (*Id*. at 205.)

On January 2, 1999, Q.T. Kramer, M.D., examined Plaintiff for severe left knee pain and low back pain, took X-rays, tried to get an insurer's approval for MRIs, and prescribed Parafon Forte, an analgesic-skeletal muscle relaxant, three times daily. (Tr. at 264.) Dr. Kramer noted that Plaintiff had experienced low back pain from the time of the 1994 accident, that he had experienced left leg numbness down to his knee, and that he could not sit or stand for prolonged periods of time. (*Id* at 263.) He further noted that Plaintiff had left knee pain, had trouble getting up and down from the chair, had pain medially, and was unable to work at that time. (*Id*.) On January 27, 1999, Dr. Kramer noted that Plaintiff's condition had not changed and that he experienced back spasms when he tried to do anything. (*Id* at 264.) Dr. Kramer stated that Plaintiff was disabled. (*Id*.)

On February 16, 1999, Joyce Matthews, M.D., interpreted an MRI of Plaintiff's left knee. The MRI showed: "1. Medial plateau fracture far medially along the plateau with articular extension of the fracture, but no depression of the fracture.  Fracture does extend into the infraplateau trabecular area of the tibia.  2.  Minimal joint effusion.  3. Significant oblique tear of both the anterior and posterior horns of the medial meniscus."  (Tr. at 270.)  A lumbar spine MRI showed: "1. Degenerative disc disease L5-S1 with mild disc bulge but with foraminal compromise evident bilaterally. 2. Otherwise negative."  (*Id*. at 271.)

On February 19, 1999, Dr. Kramer recommended surgery for the tear of the medial meniscus, and suggested waiting to investigate Plaintiff's low back complaint until his knee improved.  (Tr. at 264.)  Plaintiff returned to Dr. Kramer on March 26, 1999, Plaintiff complained of knee pain, and asked the doctor to scheduled the arthroscopic exam and surgery.  (*Id*. at 260.)  On April 15, 1999, Dr. Kramer performed a partial medial meniscectomy of Plaintiff's left knee.  (*Id*. at 261.)  In April and May of 1999, Dr. Kramer provided Plaintiff with post-operative care and felt that, overall, he was doing well following the surgery although he was still not able to return to work.  (*Id*. at 256, 260.)

On June 4, 1999, Plaintiff returned to Dr. Kramer and reported that he could not squat, was unable to put much weight on his leg, and could not walk very far.  Dr. Kramer injected Plaintiff's knee and prescribed physical therapy three times weekly for three weeks.  (Tr. at 256.)  On June 25, 1999, Dr. Kramer noted that Plaintiff walks with a slight limp.  (*Id*.)  Plaintiff stated the last injection did not help him and that his first and second toes were numb.  (*Id*.)  Dr. Kramer provided a letter to the Texas Workers' Compensation Commission giving his opinion that Plaintiff's knee injury was aggravated by his job as a prison guard which required constant repetitive bending, squatting,

stooping, and the continuous use of his left leg.  (*Id.* at 255.)

On July 9, 1999, Dr. Kramer stated that Plaintiff had been disabled since he was injured, describing his knee pain as severe and throbbing.  The doctor prescribed more physical therapy.  (Tr. at 254.)

Mark Huff, Jr., M.D., an orthopedic surgeon examined Plaintiff for the Texas Workers' Compensation Commission on August 3, 1999.  Dr. Huff diagnosed Plaintiff with torn medial meniscus, left knee; degenerative disc disease lumbar spine L5-S1; lumbar radiculopathy; and observation lateral recess stenosis L5-S1.  With respect to Plaintiff's work status, Dr. Huff stated that

Plaintiff was not able to carry out any type of work, even sedentary, until he had further investigation and treatment of his lower back.  He also noted that Plaintiff was then still in a rehabilitation phase of his treatment for his left knee.  Dr. Huff also reported that it was very difficult to determine exactly when Plaintiff's disability began, but in reasonable medical probability he had been disabled since December 20, 1998, and in any event no later than January 6, 1999.  (Tr. at 247-51.)

According to Paul Renton, Jr., M.D., an August 18, 1999 MRI showed: "1. Interval surgery with partial meniscectomy of the medial meniscus. 2. A tear of the posterior horn of the medial meniscus is present intersecting inferior surface. 3. Healing tibial plateau fracture medially.  The tibial plateau is maintained, however, there is some chondromalacia at the base."  (Tr. at 269.)

On October 7, 1999, Dr. Kramer performed another partial medial meniscectomy and arthroscopy on Plaintiff's left knee.  (Tr. at 275.)  On May 19, 2000, Dr. Kramer wrote the insurer that Plaintiff never really got better after the October 1999 surgery.  He still had pain and swelling

in his knee and a slight limp.  Cortisone injections provided only temporary relief.  Dr. Kramer thought that Plaintiff would need a total knee replacement, but he first wanted to try three injections of Synvisc.  After the third injection, Dr. Kramer noted that Plaintiff complained of throbbing and had shown no improvement.  (Tr. 276, 282.)

Dr. Kramer examined Plaintiff on August 18, 2000 when Plaintiff complained of tenderness and throbbing of his knee.  Dr. Kramer gave him another injection and noted that Plaintiff weighed three hundred and nineteen pounds and had been up to three hundred and fifty pounds.  Dr. Kramer recommended another MRI because of Plaintiff's continued complaint of pain, popping, and locking of his knee and his inability to return to work.  (Tr. at 283.)

On September 15, 2000, Plaintiff weighed three hundred and twenty-four pounds.  (Tr. at 283.)  Dr. Kramer noted that a September 6, 2000 MRI showed removal of the main portion of the medial meniscus, a horizontal tear in the remaining medial meniscus, a little bit of extrusion of the medial meniscus anteriorly beneath the medial collateral ligament, and a small oblique tear of the posterior horn of the lateral cartilage.  (*Id.*)  Dr. Kramer gave him another cortisone injection and recommended another arthroscopic treatment for the knee with the removal of damaged cartilage.  (*Id.*)

Dr. Virgil G. Frando, M.D., a physical medicine and rehabilitation specialist, evaluated Plaintiff on March 12, 2001, for the Texas Workers' Compensation Commission.  (Tr. at 288-95.)  Plaintiff complained of left knee and low back pain, ranging from zero to ten on a scale of one through ten, "increased by activity such as walking or standing" and "relieved by taking pain pills and by [lying] down."  (*Id.*)  Dr. Frando's diagnoses were: "1. Torn medial meniscus, left knee.  2. Status-post three arthroscopies by Dr. Kramer, with partial medial meniscectomy.  3. Degenerative

disc disease, lumbar spine L5-S1.  4. Lumbar radiculopathy." (*Id.*)  He concluded that Plaintiff had reached maximum medical improvement at the date of the examination and gave him a workers' compensation rating of twenty-one per cent disability to the whole person.  (*Id.*)

On April 21, 2001, Donald L. Wehmeyer, M.D., another Texas Workers' Compensation designated doctor, examined Plaintiff.  (Tr. at 300-02.)  His diagnosis was trauma to the left knee; trauma to the lumbosacral spine; postop multiple arthroscopies (left knee); postop multiple meniscectomies (left knee); degenerative disc disease L5-S1 with a mild disc bulge, but with foraminal compromise bilaterally; morbid obesity; degenerative disc disease (lumbar spine, L5-S1); and lumbar radiculopathy.

On May 23, 2001, Plaintiff complained to Dr. Kramer that "his knee [was] bothering him a lot." (Tr. at 286.)  He said that he was trying to lose weight, but was not really losing much.  He lost ten pounds and weighed three hundred and fifty pounds.  (*Id.*)  Dr. Kramer gave him another injection into his knee joint. (*Id.*)

On June 11, 2001, Dr. Wehmeyer stated that Plaintiff had reached maximum medical improvement by March 12, 2001 and had an impairment (based on the combined left knee and lumbar spine impairments) of twenty-five per cent to the whole body.  (Tr. at 296-99.)

On July 6, 2001, Dr. Kramer examined Plaintiff and gave him another knee injection.  (Tr. at 286.)  Plaintiff had lost six pounds since his last visit.  (*Id.*)  The injection lasted only three weeks, and Plaintiff returned on August 17, 2001, for another injection.  (*Id.*)  Plaintiff was using a cane and had some pain with straight leg raising on the left.  (*Id.*)  He complained of left leg numbness.  (*Id.*)

On August 31, 2001, Dr. Kramer wrote to Plaintiff's Workers' Compensation insurer, in pertinent part:

I will enclose for you a copy of a form which I filled out . . . Functional Assessment of the knee.  At the end of the second page, I wrote that the patient was capable of doing sedentary type work. I want to rescind or change that opinion.  I feel that I was in error when I stated this patient was capable of that type of work.  If you will read through the form on page one you will see where he uses a cane. He has difficulty bearing weight. He has difficulty sitting.  He cannot ride in a car very much.  He has a slight limp.  He has some arthritic changes and complaints with his left knee.   He also complains of low back pain.  Pain is stated to go down his leg from the back  . . . .

Recently I talked to the patient again.  We discussed the problems and the limitations that he has.  He states that he cannot sit for even 30 minutes without having undue pain in the back and the knee. He states his standing ability is limited to 30 minutes or less also.  He uses an electric cart when he shops at a grocery store. . . still has pain in the low back . . . .

Thus I want to rescind the sedentary work limitation which I gave this patient.  I want to change it now to disabled from gainful employment and disabled even from sedentary work.

(Tr. at 285.)

On September 4, 2001, Stephen J. Chirogotis, PA-C, examined Plaintiff at the Wichita Falls, Texas, VA Outpatient Clinic.   (Tr. at 305-06.)   In addition to Plaintiff's musculoskeletal impairments, Chirogotis noted hypertension and that Plaintiff "admits to being quite depressed." (*Id*.)  Chirogotis also noted that "apparently through some negotiation errors with Dr. Kramer, Dr. Kramer signed a release allowing him to be able to work in some limited capacity which has terminated his disability completely.  (*Id*.)  He intends to discuss this with Dr. Kramer in the near future."   (*Id*.)   Chirogotis prescribed Prozac, an antidepressant, as well as medications for hypertension and a hiatal hernia with gastroenterologic reflux disease.  (*Id*.)

On October 29, 2001, Dr. Kramer gave Plaintiff another injection in his left knee.  (Tr. at 286.)  Plaintiff reported to the VA Clinic on October 29, 2001, that he was doing much better on

8

Prozac, had lost weight, and had a better mental attitude. (*Id.* at 304.) The VA doctor continued his medications. (*Id.*) On December 28, 2001, Dr. Kramer gave Plaintiff another injection in his left knee and again discussed with him the need for a total knee replacement. (*Id.* at 286.)

On January 28, 2002, Plaintiff complained of drowsiness and blurred vision at the VA Clinic. (Tr. at 303.) Doctors there advised him to take his Prozac in the evening. (*Id.*) They noted an improvement in his mood and a small loss of weight. (*Id.*)

On February 22, 2002, Dr. Kramer wrote a drug company concerning the necessity for Plaintiff's Parafon and Darvocet related to his 1993 or 1999 back injury and noting that he may be required to take them permanently. (Tr. at 284.)

R. Wade McKenna, D.O., a board certified orthopedic surgeon examined Plaintiff on July 2, 2002, and stated:

> PE: Bone on bone arthrosis of his left knee, crepitus, full extension and flexion of 120 which is great. However on standing x-rays he has bone on bone arthrosis of the medial joint space. He's going into tibia varus, getting a little bowlegged on this left leg compared to the right. He has significant patella femoral disease with crepitus and pain in his knee. Locking and catching, night time pain. Neurosensory vascular appears to be intact to bilateral lower extremities. No dermatologic changes. Good skin and hair pattern to the ankles. He has an impairment rating 25% in this left knee since the time of his injury. [His] knee is lifetime medical of the left knee. What he'll end up needing is TKA. He's probably needed this the last several years. I find it difficult to believe and indeed in the words of the patient, the arthroscopy, Synvisc, Hyalagan, steroids, nothing's made much of a difference. He's bone on bone on standing x-rays, I think he needs to work towards TKA left knee. However, it should be noted he started out at 250 lbs. at the time of the injury. He's over 350 lbs. now. Associated with the inactivity and with this injury and dramatic damage to the left knee, he's having to walk with a cane. He has no significant activity level and I think we need to get him to a doctor-organized and doctor-monitored weight loss program to help him get his weight down. I'd like him to be under 300 lbs. but definitely at least on the downward slide before we talk about replacing his knee. It's been a long term process to get to this and now it will be a long term process to get him back in shape. However, without a new knee I don't think he'll ever be back in good shape. We need to get his weight down . . . . I think [Texas Rehabilitation Commission] may be able to help him find

> a program to help lose the weight as well as Work Comp since I would look at weight loss as a complication of this injury and the surgeries to this point . . . He's also been on Darvocet for quite some time. We've talked about the risks of this being an opioid and the physical symptoms that can happen when you restrict access to the drug. He takes them mostly to get some sleep at night secondary to the pain and problems with the left knee. I'll work on getting him off the Darvocet . . . Hopefully we can get him pretty narcotic free before we talk about any big operative intervention and get him started on the weight loss plan.

(Tr. at 318-19.)

Joyce J. Ritchie, M.D., took an x-ray of Plaintiff's left knee on May 8, 2003, and the x-ray showed mild narrowing of the medial joint compartment with moderate-sized osteophytes projecting medially off the femoral condyle and tibial plateau. (Tr. at 330.) The joint spaces otherwise appeared well maintained, leading to a diagnostic impression of "moderate degenerative changes in [the] medial joint compartment." (*Id.*)

On May 20, 2003, Dr. McKenna examined Plaintiff again and noted:

Unfortunately for [Plaintiff] he's [really] not a whole lot better after the [epidural steroid injections ("ESI's")]. He does have a subligamentous disc herniation, some fairly significant stenosis, bilateral neural foraminal compromise at [L5/S1] with spondylitic deficit and some hypertrophy at [L4/S5] resulting in neural foraminal stenosis in this area. The subligamentous disc herniation [affects] both S1 nerve roots. I think this is what I'm worried about. With the ESI's not making a huge difference for him and continued pain and problems and the fact he's been suffering with this for a long time now, I think he needs to be sent to a spine surgeon to talk about getting him fixed. We'll get him set up for referral for spine surgery and there's no doubt [Plaintiff] needs a new knee. I think that's the only way to be able to get him completely over the hump with this leg, but at this time with as bad as his back is, I'm afraid we'd make everything worse with knee replacement. We need to get his back strong and we stand a chance of getting him over the hump with his pain before we talk about doing anything else from a surgical perspective. We'll get all the paperwork done and sent for spine surgery.

(Tr. at 331.)

On June 12, 2003 (almost fifteen months after Plaintiff's second hearing before an ALJ), Dr. Frando examined Plaintiff again, this time as a consultative examiner for the Commissioner. Dr. Frando recounted Plaintiff's history, and on examination stated:

10

Weight 329 lbs. . . . is able to ambulate without any assistive device and with no discernible antalgic gait. He is able to transfer from the chair to the examining table without much difficulty.

\* \* \*

The lower back range of motion was also measured with a single inclinometer placed at the L2 prominence of the spinous process. Forward flexion was 68 degrees. There is mild tightness of the lumbosacral paraspinal muscles. There are some tender points noted on the lumbosacral paraspinal muscles as well.

\* \* \*

Examination of the lower extremity showed no gross muscular atrophy, weakness, paralysis. Straight leg raising test as 70 degrees on the left and 80 degrees on the right. Range of motion of the right knee was 0 to 130 degrees, similar to the left knee. The circumference of the midpatellar area on the right was 47.5 cm compared to the left, which was 47.2 cm. There is negative McMurray's test, negative Drawer's test, negative Lachman's test and negative varus valgus test on the right knee. There is no gross swelling, erythema or warmth noted, although there is mild tenderness over the medial condylar region of the right knee. Deep tendon reflexes are 1+ in both knees. There is mild decrease of dorsoflexion of the big toe and foot at 4+/5 on the left and 5/5 on the right. There is decrease in sensation of the anterior thigh around the distal third region and the dorsum of the foot and the lateral aspect of the foot on the left. The patient was also able to walk on tiptoe, but had difficulty with walking on the heels, especially on the left, but was able to do so on the right. He refused to squat because of perceived pain in the knee. He was able to do tandem walking and was able to stand on alternating leg, although he complained of pain in the left leg on standing. The patient walks without any discernible antalgic gait and is not using any assistive device.

(Tr. at 320-24.) Dr. Frando's diagnostic impressions were "1. Left knee pain status post three arthroscopies with partial medial meniscectomy with a torn medial meniscus. 2. Degenerative disc disease of the L5-S1 with mild disc bulge. 3. Lumbar radiculopathy history. 4. Degenerative arthritis of the medial condyle of the left knee. 5. Morbid obesity." (*Id.*)

Dr. Frando commented that Plaintiff was still undergoing treatment by an orthopedic surgeon, Dr. McKenna for possible total knee arthroplasty, and that he was being evaluated and managed by Dr. Myles, the spine surgeon for his lumbar radiculopathy. He added that Plaintiff's ongoing treatment included a weight reduction program. (*Id.*)

On the same day, Dr. Frando provided a "Medical Assessment of Ability to Do Work-Related Activities (Physical)," in which he stated the opinions that: Plaintiff's lifting/carrying was affected such that he could "occasionally" (up to three hours out of eight) lift 20 pounds; Plaintiff's standing/walking was affected such that he could stand and/or walk less than two hours in an eight hour workday; Plaintiff's sitting was affected such that he could sit less than six hours in an eight hour workday; Plaintiff could climb, stoop, crouch, kneel or crawl "frequently" but only "occasionally" balance; Plaintiff's pushing/pulling was limited; and the environmental factors of temperature extremes and vibration were affected.  (*Id*.)

**B.**     **Plaintiff's Hearing**

Plaintiff's hearing took place on March 21, 2002.  (Tr. at 29-66.)  Plaintiff appeared in person and was represented by Robert Hampton, his attorney.  (*Id*.)  The witnesses were Plaintiff and Robert Saunders, a VE.  (*Id*.)

**1.**     **Plaintiff's Testimony**

Plaintiff stated that he left his most recent job at the prison because of the wear and tear of taking down unruly inmates every day and his physical problems.  (Tr. at 35.)  Plaintiff stated that he home schooled his boys with the help of family and church friends, spending about eight hours a week in this activity.  (*Id*. at 39-40, 52-53.)  He said that his surgeries kept him from taking his sons to school and picking them up on a daily basis.  (*Id*.)  He said he drove to the grocery store once or twice a week.  (*Id*.)  He attended church, but he had no other social activities.  (*Id*.)  He said that his longest driving trip in the past two years had been from Wichita Falls to Fort Worth, and he had not taken any vacations.  He testified that he was not able to do yard work.  (*Id*. at 41.)  Plaintiff said that he was one hundred pounds above his usual weight and twenty inches over his usual waist size.

(*Id*. at 42.) Plaintiff, who had a cane at the hearing, testified that he used the cane about fifty percent of the time. (*Id*.) He said that he needed it when his injections wore off and in the grocery store when a cart was not available. (*Id*. at 43.) He estimated that with his cane he could walk about fifty yards. (*Id*. at 44.) He testified that his walking was limited by "pain in [his] knee . . . and [those] muscle spasms . . . in his lower back [which radiate down his left knee [and] the left side of his leg.]" (*Id*.) He said that he needed a thirty to forty minute break between walking his maximum distances. (*Id*.) He stated that he could stand for five to ten minutes without a cane, and for twenty to thirty minutes with the cane. (*Id*.) Plaintiff testified that his back and shoulder problems limited his lifting ability to ten to twenty pounds, three to four times in an eight hour period. (*Id*. at 46-47.) He told the ALJ that he could sit only thirty minutes without having to move, lie down on the floor, roll, and stretch. (*Id*.) Plaintiff stated that he regularly experienced "spasms" and that when one occurred, he had to discontinue his activity due to the distraction. (*Id*.) He said he cooked and, with the help of his sons, did the laundry. (*Id*. at 49.) Plaintiff testified that he could not push in a clutch with his left foot and leg, nor reach upward and forward with his right arm due to pain. (*Id*. at 50-51.) He stated that he was not under medical care for his shoulder pain, and had not been to an emergency room or hospital because of shoulder pain. (*Id*. at 54-55.) He claimed his mood was irritable, due to financial stress and pain. (*Id*. at 51-52.)

### 2. The VE's Testimony

The ALJ posed a hypothetical question to the VE, asking him if a person of Plaintiff's age, education, and work experience, with the following limitations, would be capable of performing Plaintiff's past work: The person would be capable of lifting and carrying, pushing or pulling a maximum of twenty pounds (ten pounds on a regular basis); would be able to stand and/or walk a

total of three hours in a workday (was only able to walk a negligible amount on uneven terrain); would be able to occasionally stoop and crouch; would infrequently or rarely be able to kneel, climb ramps, stairs, or balance; would not be able to use foot controls with the left foot; and would only be able to reach above his head on an occasional basis with his dominant arm.  (Tr. at 58-59.)  The ALJ said that the hypothetical person that the ALJ described would not be able to perform Plaintiff's past work.  (*Id*. at 59.)

The ALJ then asked the VE if there would be other occupations such an individual could perform.  (*Id*.)  The VE stated that the hypothetical person could be an investigator of fraud in retail trade, a job which was sedentary and skilled.  (*Id*. at 60.)  He testified that there were 1,000 to 1,500 positions locally and 75,000 in the national economy.  (*Id*.)  The VE testified that the person in the ALJ's hypothetical could be a police dispatcher, which was sedentary and semi-skilled.  (*Id*.)  He said that there were 7,500 of these positions locally and 175,000 nationally.  (*Id*.)  Additionally, he named the position of classification clerk within the penal system, which was sedentary and skilled.  (*Id*.)  He stated that there were 1,200 of these positions locally and 50,000 in the national economy.  (*Id*.)  The VE testified that the first two jobs were described in the Dictionary of Occupational Titles ("DOT"), but that the DOT did not describe the classification clerk job.  (*Id*.)  The VE stated that the classification clerk job would require some walking.  (*Id*.)  Upon questioning by the ALJ, the VE replied that these three jobs could be done with a sit and stand option involving changing positions every thirty minutes.  (*Id*. at 61.)

On cross-examination, the VE stated that if a person became distracted for a period of thirty to forty minutes, it would impact the person's ability to hold those jobs.  (Tr. at 61.)  He admitted that staying focused was an important part of the jobs he had mentioned.  (*Id*. at 62.)  The VE

14

testified that using a cane would not tend to interfere with the jobs.  (*Id*.)   However, he stated that a person's irritability and inability to get along with others would tend to interfere with those jobs because the jobs required good public relations skills.  (*Id*. at 63.)

### C.      The ALJ's Findings

On September 5, 2005, the ALJ issued an unfavorable decision on Plaintiff's application for DIB.  (Tr. at 11-27.)  In relevant part, the ALJ found that Plaintiff had severe impairments of "a torn medial meniscus of the left knee with a history of [four] arthroscop[ies] [] (three since 1998); a disc bulge at L5-S1 and minimal spurring at C5-C6 and C6-C7; a history of a right rotator cuff tear; obesity; hypertension; and mild cariomegaly."  (Tr. at 16-17.)  The ALJ found that these severe impairments did not meet or equal the criteria of any of the listed impairments described in 20 C.F.R. Pt. 404, Supt. P., App. I (the "Listings").  (*Id*.)  She further found that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, but had not experienced any episodes of decompensation.  (*Id*. at 21.)  She found that Plaintiff's subjective complaints were not totally credible.  (*Id*. at 21-22, 25.)  The ALJ found that Plaintiff did not have the RFC to perform his past work, but that he had the RFC to perform as an investigator of retail fraud, as an inmate classification clerk, and as a police radio dispatcher.  (*Id*. at 24-5.) She concluded that he was therefore not under a disability as defined in the Social Security Act.  (*Id*.)

## III.      Legal Standards

A claimant must prove that he is disabled for purposes of the Social Security Act to be entitled to social security benefits.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security

Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational

testimony, or by other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g) (West Supp. 1999).  Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564.  The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.

## IV.   Analysis

### A.   The Sitting Requirement

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ found that Plaintiff had the RFC to perform sedentary work and could "sit as required." (Tr. at 25, finding No. 6.)  Plaintiff claims that the ALJ failed to adequately explain why she rejected the examining physician's opinion that Plaintiff could sit for less than six hours in an eight hour workday.  (*Id*. at 325.)

If an ALJ's RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p.  Social Security Rulings are binding on the Commissioner.  *Spellman v. Shalala*, 1 F.3d 357, 361 n.7 (5th Cir. 1993).  "As a general rule, where the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required." *Hall v. Schweiker*, 660

F.2d 116, 119 (5th Cir. 1981) (per curiam) (citing *Morton v. Ruiz*, 415 U.S. 199 (1974)). Furthermore, "[s]hould an agency in its proceedings violate its rules and prejudice the result, the proceedings are tainted and any actions resulting from the proceeding cannot stand." *Id.*

The only RFC assessment by an examining physician in this case is that of Dr. Frando. (Tr. at 325.)  He conducted a post-hearing consultative examination at the ALJ's request.  (*Id.*)  Dr. Frando stated that Plaintiff's sitting was affected and that he could sit "less than six hours in an eight hour workday." (*Id.*)  The ALJ stated that she concurred generally with Dr. Frando's findings, but nevertheless found that Plaintiff should be able to perform work with normal breaks while seated much of the time.[2] (*Id.* at 22, ¶ 4.)  The only reason the ALJ gave for not accepting Dr. Frando's findings regarding the sitting requirement was that "Dr. Frando initially marked that there were no restrictions on sitting."[3] (*Id.*)   The Commissioner argues that Dr. Frando's medical opinions that Plaintiff could only sit less than six hours and could only stand and walk for less than two hours in an eight hour workday were not consistent with diagnostic findings, clinical observations, examination notes, and the objective medical evidence.  (Def.'s Br. at 6.)  However, the ALJ did not give inconsistency with the objective medical evidence as her reason for rejecting Dr. Frando's RFC assessment.  Rather, the ALJ relied upon what amounted to an erasure.  Plaintiff correctly points out that an ALJ's decision must stand or fall with the reasons stated in the ALJ's decision, as adopted

---

[2] Inexplicably, the ALJ stated that Dr. Frando gave "no explanation whatsoever for restrictions concerning dust."  (Tr. at 22.)  However, Dr. Frando did not give Plaintiff a dust limitation.  (Tr. at 326.)

[3] Dr. Frando marked the box which showed that Plaintiff's sitting was not affected, but then, he scratched out the first marking and checked the box which indicated that sitting was affected.  (Tr. at 325.)  Dr. Frando thus concluded that Plaintiff could sit less than six hours in an eight hour workday, and he indicated this in his assessment.  (*Id.*)

by the Appeals Council. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). This is particularly true here, where Dr. Frando had examined Plaintiff twice, once for the Texas Worker's Compensation System and again because the ALJ appointed Dr. Frando as an independent consultative examining physician for the Commissioner. In *Myers v. Apfel*, the Fifth Circuit remanded a case for further proceedings after it concluded that the ALJ had improperly determined the claimant's RFC and that the ALJ had disregarded the opinions of treating physicians without presenting good cause for rejecting those opinions. *Myers v. Apfel*, 238 F.3d 617, 620-21 (5th Cir. 2001). The ALJ did not present good cause for rejecting Dr. Frando's RFC determination regarding Plaintiff's sitting limitation.

The ALJ's determination that Plaintiff could perform sedentary work was not supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Anderson v. Schweiker,* 651 F.2d 306, 308 (5th Cir.1981). A Court reviewing the Commissioner's decision must look at the entire record. *Western v. Harris,* 633 F.2d 1204 (5th Cir.1981).

The ALJ determined Plaintiff could perform sedentary work which required the Plaintiff to sit up to six hours per work day. The ALJ further found Plaintiff could stand and walk up to two hours per eight hour work day. (Tr. at 23.) The consultative examining doctor, Dr. Frando, gave a medical opinion with respect to Plaintiff's abilities to sit and walk. The ALJ accepted Dr. Frando's opinion, except with respect to Dr. Frando's restriction on dust; however Dr. Frando did not give a dust restriction. (*Id*.) Nevertheless, the ALJ concluded that, despite Dr. Frando's medical opinion that Plaintiff could sit for less than six hours per eight hour workday, Plaintiff should be able to perform sedentary work with normal breaks while seated much of the time because Dr. Frando

initially marked that there were no restrictions on Plaintiff's sitting.  (*Id.*)

It is within the ALJ's discretion to make determinations about the credibility of evidence, however, the ALJ may not substitute his judgment for that of vocational or medical experts.  *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *West v. Sullivan,* 751 F. Supp. 647, 648-49 (N. D. Tex. 1990).  The record does not support the Commissioner's claim that Dr. Frando's opinion was not supported by or consistent with diagnostic findings, clinical observations, examination notes, and the objective medical evidence.  Rather, Dr. Frando's determination was consistent with the records of  Plaintiff's treating physicians and surgeons.  Dr. Frando commented in his report that Dr. McKenna, an orthopedic surgeon, had recommended a total knee replacement for Plaintiff's  "bone on bone" knee joint and Dr. Myles, a spine surgeon, had recommended back surgery for his lumbar radiculopathy.  (Tr. at 324.)  The surgeries had been delayed to permit Plaintiff to get his weight under control.  (*Id.*)  Additionally, on January 25, 1999, Dr. Kramer, a treating orthopedic surgeon stated that "Plaintiff [was] unable to sit or stand for prolonged periods of time."  (*Id*. at 263.)  The record does not contain any medical evaluation by an examining physician which states Plaintiff can sit for six hours or perform other tasks needed for sedentary work, and no examining physician stated Plaintiff could sit for six hours.[4]  Viewing the record as a whole, this Court concludes that the ALJ's determination Plaintiff could meet the sitting requirement for sedentary work was not supported by substantial evidence.  Accordingly, this case is remanded to the Commissioner for review consistent with these findings.

---

[4]  The ALJ did not rely upon the state agency consultants' opinions because they found Plaintiff could perform medium work, findings that were not consistent with any of the treating or examining doctors.  (Tr. at 23.)

### B.      The Standing or Walking Requirement

Plaintiff contends that the ALJ's decision that Plaintiff could stand or walk for a total of three hours in an eight hour workday is not supported by substantial evidence and constitutes prejudicial legal error.  Dr. Frando's RFC assessment stated that Plaintiff could stand and/or walk for less than two hours in an eight hour workday.  (Tr. at 325.)  The ALJ, while generally concurring with Dr. Frando's assessment, found instead that Plaintiff could stand or walk for a total of three hours in an eight hour workday.  (Tr. at 25, Finding 6.)  The ALJ offered no explanation for this rejection of Dr. Frando's opinion on standing.  The Commissioner did not specifically address Plaintiff's contention in its responsive brief.  Substantial evidence does not support the ALJ's opinion in this regard, and it resulted in prejudicial legal error for the reasons previously stated in connection with the ALJ's rejection of Dr. Frando's sitting limitation.  Again, reversal and remand is warranted.

### C.      Pushing and Pulling

Plaintiff contends that the ALJ did not accept Dr. Frando's opinion that Plaintiff's capacity for "pushing/pulling" was "limited" unless it is equated with Plaintiff's not being able to use foot controls with his left foot.  (Pl.'s Br. at 29.)  Plaintiff also contends that the ALJ did not give a reason for rejecting Dr. Frando's opinion in this regard.  The Commissioner states that the ALJ appropriately determined that Plaintiff was limited in pushing or pulling, in that he had no use of foot controls with the left foot, and that he could reach above his had with the dominant arm occasionally.  (Def.'s Br. at 10.)  The Commissioner argues that the ALJ stated in her hypothetical to the VE that "the individual is capable of lifting and carrying, pushing or pulling a maximum of 20 pounds, 10 pounds on a regular basis," and the fact that the ALJ did not retype that Plaintiff "could push/pull 20 pounds, 10 pounds on a regular basis" in her decision is merely a typographical

error.  (*Id.* at 11.)  In light of this Court's findings that the Commissioner's decision must be reversed and remanded on other grounds, this issue is not dispositive.  However, if a "typographical error" occurred in this regard, the ALJ may correct it.

   **D.   Obesity**

   Plaintiff was diagnosed with morbid obesity.  (Tr. at 322.)  The Commissioner was required to consider the effect of a claimant's obesity on the applicable musculoskeletal, respiratory, and cardiovascular listings.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 1.00(Q), 3.00(I), 4.00(F).  Furthermore, "when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."  *Id.*

   In this case, the ALJ found that Plaintiff's obesity was a severe impairment.  (Tr. at 25.)  In determining that Plaintiff's impairments did not meet a Listing, the ALJ recited that she considered SSR 02-01 (which instructs how obesity must be weighed in the sequential disability evaluation).  (Tr. at 25, 20-23.)  The ALJ stated that she considered the effects of Plaintiff's obesity on his musculoskeletal impairment, mentioning that some doctors had attributed any lost motion to Plaintiff's size or "give-way weakness" and that "[plaintiff's] weight gain likely affected his knee pain."  (*Id.* at 20.)  The ALJ also mentioned that she considered the effects of Plaintiff's gaining more than one hundred pounds within a year on his cardiovascular system.  (*Id.* at 20-21.)

   Even though the ALJ recited that she had considered Plaintiff's obesity in accordance with SSR-02-01p, she did not explain at steps four and five "the effect obesity ha[d] upon [Plaintiff's] ability to perform routine movement and necessary physical activity within the work environment."  As SSR-02-01p explains, "[i]ndividuals with obesity may have problems with the ability to sustain

a function over time." SSR-02-01p. An ALJ's RFC assessment "must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week, or an equivalent work schedule. *Id.* The Ruling cautions that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The ALJ did not assess the effects of Plaintiff's morbid obesity in conjunction with his severe knee, back, and shoulder impairments at step five to determine whether there was other work that Plaintiff could perform. The Commissioner argues that the ALJ accommodated for Plaintiff's obesity by finding that he had the RFC to perform sedentary work and contends that the medical evidence shows that no additional limitations were warranted due to Plaintiff's obesity. (Def.'s Br. at 14.) However, the ALJ's opinion does not reflect any such findings. On remand, the ALJ should explain the limitations on functions caused by Plaintiff's morbid obesity, if any, in determining whether there is other gainful employment available in the national economy that the claimant is capable of performing.

The Commissioner's decision is reversed and remanded for further consideration in conformity with this opinion.

Signed, September 19, 2005.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE